## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JAMAL COLBERT, | ) | Case No.   2:23-cv-1245 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RESOURCES FOR HUMAN | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| *Defendant*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Jamal Colbert, by and through the undersigned counsel, now files the within Complaint in Civil Action against Defendant, Resources for Human Development, Inc., averring as follows:

## PARTIES

1.      Plaintiff, Jamal Colbert (hereinafter "Plaintiff"), is an adult individual who currently resides at 740 10th Street, Pitcairn, Pennsylvania 15140.

2.      Defendant, Resources for Human Development, Inc., (hereinafter "Defendant"), is a Pennsylvania domestic non-profit business corporation with a principal place of business located at 4700 Wissahickon Avenue, Suite 126, Philadelphia, Pennsylvania 19144.  Defendant also has business operations located at 3113 Babcock Boulevard, Pittsburgh, Pennsylvania 15237 (hereinafter, the "Babcock Boulevard Facility").

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings this lawsuit asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII").

4.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiff alleges violations of the Pennsylvania Human Relations Act (hereinafter, the "PHRA"), 43 P.S. § 951, *et seq.*, and the factual basis for such claims is so related to the Title VII claims that they form part of the same case or controversy under Article III of the United States Constitution.[1]

5.      Venue is also proper in this Court as Plaintiff is a resident and citizen of Pennsylvania and a substantial part of the events or omissions giving rise to the claims averred herein occurred in the City of Pittsburgh, Allegheny County, Pennsylvania, which is located within the geographical confines of the United States District Court for the Western District of Pennsylvania.  Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

6.      This Court has personal jurisdiction over Defendant because Defendant routinely and regularly conducts business in the Commonwealth of Pennsylvania and routinely and regularly solicits business in Pennsylvania.  Further, as averred more fully below, Defendant violated numerous statutory provisions of Title VII and the PHRA, and each and every one of the events giving rise to Defendant's unlawful conduct, including the harm that Plaintiff sustained therefrom, occurred in Pennsylvania.  As such, this Court, at bare minimum, may exercise personal jurisdiction over Defendant because Defendant has the required minimum contacts with this forum

---

[1] Notably, Pennsylvania state courts interpret the applicable provisions of the PHRA in accord with their counterpart provisions in Title VII.  See *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 138 (E.D. Pa. 2020).

for purposes of Pennsylvania's long-arm statute and the Due Process Clause of the United States Constitution.

7.      This Court may therefore properly maintain personal jurisdiction over Defendant in light of Defendant's extensive conduct within Pennsylvania and this judicial district in particular, and the exercise of personal jurisdiction complies with traditional notions of fair play and substantial justice.

8.      Moreover, Plaintiff has satisfied all procedural and administrative requirements set forth in 29 U.S.C. § 626, and 42 U.S.C. § 2000e-5 in that:

   a.   On or about August 26, 2022, Plaintiff filed a timely administrative complaint alleging racial and disability discrimination with the Equal Employment Opportunity Commission (hereinafter, the "EEOC").

   b.   On or about April 11, 2023, Plaintiff received permission for the right to sue from the EEOC, wherein Plaintiff was afforded 90 days within which to timely file an action in federal or state court.  With the filing of the instant Complaint, Plaintiff has hereby satisfied that procedural requirement.

9.      A true and correct copy of the Notice of Determination issued by the EEOC is attached hereto, made a part hereof, and marked as **Exhibit A**.

## <u>GENERAL ALLEGATIONS</u>

10.     Plaintiff is an African American male, and he was employed with Defendant from January 2020 until his unlawful termination on March 25, 2022.

11.     At all times relevant hereto, Plaintiff reported to Defendant's Babcock Boulevard Facility.

12.     In approximately January 2020, Plaintiff commenced his employment with Defendant.  At that time, Plaintiff worked in a position titled "In-Home Support and Care." Plaintiff was classified as a non-exempt employee and was paid on an hourly basis at a rate of $18.25.

13.    Within this role, Plaintiff provided in-home health care and support to elderly persons, persons with a disability, and convalescents in their private residences.  Specifically, Plaintiff assisted these individuals with activities that comprise daily living, including, but not limited to, matters such as meal preparation, personal hygiene, dressing, and routine housekeeping maintenance.  Plaintiff also assisted these individuals in performing tasks of a medical nature, such as medication administration, wound care, vital signs monitoring, and range of motion exercises.

14.    On or about January 2020, Defendant assigned Plaintiff to the private home of a patient who was an elderly, Caucasian male (hereinafter, and to maintain the anonymity of the patient, "Mr. Doe").  At the very outset of this assignment, Mr. Doe immediately subjected Plaintiff to graphic verbal abuse, including, among other comments, explicit racial slurs and inappropriate sexual comments.

15.    Additionally, Mr. Doe would threaten and abuse Plaintiff by hurling physical objects at him, such as radios and other household items.

16.    For approximately two years, Plaintiff provided assistance only to Mr. Doe. Plaintiff often stayed at Mr. Doe's residence for work shifts that lasted longer than eight (8) hours and, on occasion, up to twenty-four (24) hours.

17.    Throughout this time, Mr. Doe engaged in the above-mentioned behavior on a routine, consistent, and daily basis.  More specifically, Mr. Doe abused Plaintiff no matter what the underlying circumstances were, and regardless of his (Mr. Doe's) mood, physical condition, the effects of medication, or the particular activity in which Plaintiff had interacted with Mr. Doe.

18.    For example, the racial and sexual comments that Mr. Doe directed to Plaintiff consisted of, but were not limited to, the following:

*"you nigger"*;

*"You black son of a b***h";*

*"suck my d**k"; and*

*"go f**k your [Plaintiff's] mother".*

19.     Within the first month of providing assistance to Mr. Doe, and immediately following an instance where he was subjected to verbal abuse, Plaintiff formally reported the racial and sexual remarks to his then immediate supervisor at Defendant, Griffan Coleman (hereinafter, "Ms. Coleman").

20.     Ms. Coleman acknowledged Plaintiff's report.  However, Ms. Coleman refused to take any remedial action to ensure that Plaintiff no longer experienced the discriminatory conduct inflicted by Mr. Doe.  Indeed, Ms. Coleman made no attempt to reduce or otherwise curtail Mr. Doe's discriminatory behavior and declined to transfer Plaintiff to another patient's home.

21.     Notably, prior to Plaintiff's assignment to Mr. Doe, a female African American coworker, Niya Hicks (hereinafter, "Ms. Hicks"), was responsible for Mr. Doe's care.

22.     Upon information and belief, Ms. Hicks complained to the management team of Defendant (hereinafter, "Management") regarding substantially similar racial and sexual statements she endured while performing her duties for Mr. Doe.  Subsequently, Defendant reassigned Ms. Hicks to a different patient.

23.     After Ms. Coleman declined to take action with respect to Plaintiff's initial complaint about Mr. Doe, Defendant, through its employees, agents, and/or servants, then forced Plaintiff to continue to care for Mr. Doe despite its express knowledge and awareness of the discriminatory and sexually hostile environment that Mr. Doe had previously created with Ms. Hicks and was then recreating with Complainant.

24.    In particular, sometime in January 2020, and subsequent to the events described above, Defendant's team of supervisors Ms. Coleman, Lincoln Taylor (hereinafter, "Mr. Taylor"), and Hannah Damguard (hereinafter, "Ms. Damguard") held a monthly team meeting (hereinafter, the "January Monthly Meeting"), wherein supervisors and employees, including Plaintiff, were to present reports on the wellbeing and conduct of their respective residents.  The general purpose of these monthly meetings was to provide all staff members with an opportunity to address any issues and for management to interact with Defendant's employees.

25.    At the time of the January Monthly Meeting, Mr. Taylor was Plaintiff's direct supervisor, imbued with the authority which that role would imply.  Further, at all times relevant herein, Ms. Damguard was Defendant's Program Specialist, bestowed with the authority to alter the terms and conditions of Plaintiff's employment and, further, the authority to control the conduct of the residents assigned to Plaintiff's employees, including Mr. Doe.

26.    At the January Monthly Meeting, Plaintiff reported the unabated racially and sexually hostile and discriminatory environment he experienced in his first month with Defendant.  Ms. Coleman, Mr. Taylor, and Ms. Damguard acknowledged Complainant's reports, but, in response, they made passive statements such as, "That's Mr. Doe for you."

27.    Although Plaintiff lodged his second complaint about Mr. Doe at the January Monthly Meeting, Defendant, acting through Ms. Coleman, Mr. Taylor, and Ms. Damguard once again refused to take any measures to ensure Plaintiff was no longer subjected to Mr. Doe's discriminatory conduct.  Instead, Management forced Plaintiff to continue providing assistance to Mr. Doe.

28.    Following the January Monthly Meeting, Plaintiff was relentless in reporting the unabated racially and sexually hostile work environment that was created and continuously

sustained by Mr. Doe. During numerous monthly meetings that occurred after the January Monthly Meeting, and in other instances and contexts, Plaintiff lodged additional complaints about Mr. Doe to Ms. Coleman and/or Mr. Taylor, in addition to higher ranking officials or representatives of Defendant.

29.    More specifically, in or about February 2020, Plaintiff started to report Mr. Doe's discriminatory and sexually harassing conduct to Mr. Taylor two to three times per month in order to document the extreme nature of the sexually hostile and discriminatory work environment and Defendant's utter inaction.

30.    Plaintiff continued to file reports through March 2022 on the same basis and frequency.

31.    In addition, Plaintiff reported the mistreatment and resulting hostile work environment numerous times to Defendant's Unit Director, Yvette Carrey (hereinafter, "Ms. Carrey"), who not only failed to remedy the situation, but, quite outrageously, did not take the situation seriously.

32.    Specifically, in response to one (although not by any means an outlier) of Plaintiff's complaints, Ms. Carrey merely stated to Mr. Doe, "*Oh, Mr. Doe, don't tell people to suck your peepee.*"

33.    Further, and following instances where Mr. Doe would hurl physical objects, such as radios, at Plaintiff, Ms. Carry would simply purchase a replacement item for Mr. Doe. Ultimately, Ms. Carry's passivity and inaction only served to reinforce Mr. Doe's abusive behavior toward Plaintiff.

34.    Moreover, Plaintiff documented Mr. Doe's discriminatory conduct, at times in explicit detail, within daily logbooks that Defendant maintained on each resident.

35.    The daily logbooks were reviewed by Ms. Coleman and/or Mr. Taylor on a routine basis. Tellingly, even in the face of written reports containing the above-mentioned appalling comments and actions by Mr. Doe, Defendant once again failed to take any remedial action.

36.    Indeed, throughout Plaintiff's employment, Defendant remained steadfast in its refusal to remediate the racially discriminatory and sexually harassing environment that Mr. Doe inflicted upon Plaintiff.

37.    Then, on March 22, 2022, while working a shift at Mr. Doe's home, Plaintiff was advised by Management that plumbing maintenance technicians (hereinafter, the "Plumbers") would be arriving at the home to perform maintenance work and that Plaintiff should allow them entry. Upon their arrival, Plaintiff permitted the Plumbers to enter Mr. Doe's home.

38.    At a certain point while the Plumbers were working on the issue for which they had been contracted to fix, Plaintiff discovered two (2) empty beer cans. Because Plaintiff knew that the beer cans did not belong to either him or Mr. Doe, Plaintiff proceeded to take photos of the empty beer cans and subsequently provided same to Mr. Taylor, in order to secure an official record of the occurrence.

39.    On April 11, 2022, Plaintiff was notified by Management in writing – backdated to the date of March 25, 2022 (*i.e.*, the day of the incident with the Plumbers) – that he was suspended, with administrative pay, for two (2) weeks. Initially, Management stated that the reason for said suspension was "abuse," alleging that Plaintiff engaged in "neglect" when caring for Mr. Doe.

40.    When Plaintiff pressed Management for a more specific explanation as to the "neglect" he had been alleged to have committed, Management told him that it was reported to them that Plaintiff had been "sleeping on the job."

8

41.    In response, Plaintiff vehemently and forthrightly denied (and continues to deny) these allegations.  In turn, Management told him to "treat it [the suspension] like a vacation."

42.    As the date approached for Plaintiff to return to work for Defendant, on April 25, 2022, Plaintiff was notified via a Zoom meeting with Mr. Taylor and Ms. Carrey that his employment had been terminated.

43.    Thereafter, Management provided Plaintiff with written notice of his termination, which, like his written suspension letter, was backdated to the date of March 25, 2022 (*i.e.*, the day of the incident with the Plumbers).

44.    Plaintiff was further informed by Management that an internal investigation had been performed relative to the facts surrounding his suspension.  Shockingly, when Plaintiff requested that Management disclose evidence secured during the investigation, he was told Management did not have any.

45.    Nonetheless, Management confirmed that the Plumbers were the individuals who had reported that Plaintiff was "sleeping on the job."  Clearly, in making such an allegation, the Plumbers were retaliating against Plaintiff because he reported his discovery of their beer cans on the day the Plumbers performed maintenance work in Mr. Doe's home.

46.    Throughout the course of Complainant's career of approximately eighteen (18) years as an In-Home Support/Care worker, Plaintiff has never had a disciplinary action filed against him.  Instead, Plaintiff has earned and enjoyed professional praise and has been lauded in performance reviews.  This includes the full term of his tenure at Defendant that preceded both his suspension and subsequent termination.

47.    At all times relevant hereto, Plaintiff was subjected to discriminatory treatment during his employment tenure at Defendant due to his African American race and/or gender.

48.     Further, Plaintiff's termination arose under pretextual grounds, and Defendant's decision to discharge Plaintiff was clearly a retaliatory response to Plaintiff's routine, regular, and consistent reports of the discrimination, harassment, and hostile work environment Defendant forced him to endure.

49.     As a direct and proximate cause of Defendant's discriminatory practices, outlined and detailed above, Plaintiff has developed chronic symptoms of severe anxiety, sleep issues, and depression.  As such, Plaintiff is currently seeking the treatment and direction of a psychotherapist. However, due to the loss of employment at Defendant, which resulted in the discontinuation of his medical insurance coverage, Plaintiff has struggled (and, to date, continues to struggle) to secure the financial resources for said treatment.

50.     Plaintiff has also suffered significant pecuniary losses due to his wrongful termination and the conduct described hereinabove.

**COUNT I**
**HOSTILE WORK ENVIRONMENT ON THE BASIS OF RACE**
**IN VIOLATION OF TITLE VII AND PHRA**
**42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.***

51.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

52.     To establish a Title VII hostile work environment claim against an employer, a plaintiff employee must prove: (1) the employee suffered intentional discrimination, among other ways, because of his race or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.  See *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (internal citations omitted); see, also, *Sarullo v. US Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

53.    Notably, it is now well established that an employer can create a hostile work environment by failing to take immediate and corrective action in response to the harassment or discrimination of a third-party, non-coworker when the employer knew or should have known about the harassment or discrimination.  See, e.g., 29 C.F.R. § 1604.11(e); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001); *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111–12 (8th Cir. 1997).

54.    As alleged above, in a timeframe of approximately two years and three months, particularly from January 2020 to March 2022, Mr. Doe subjected Plaintiff to express and overt racial slurs and other derogatory statements that directly commented on Plaintiff's race in a negative fashion.

55.    Oftentimes, Mr. Doe would accompany said statements with physical gestures that were violent in nature, such as hurling objects at Plaintiff.

56.     In the course of the period mentioned above, Plaintiff was inflicted with isolated incidents by Mr. Doe that were so egregious or profoundly shocking that they, in and of themselves and apart from one another, constituted intentional racial discrimination that was shockingly and extremely "severe" for purposes of Title VII.

57.    Alternatively, on the collective whole, Mr. Doe perpetrated a course of conduct upon Plaintiff that constituted a regular, consistent, and routine pattern or practice of intentional racial discrimination that was sufficiently "pervasive" for purposes of Title VII.

58.    Plaintiff considered the intentional racial discrimination by Mr. Doe to be unwelcome and at no time did Plaintiff ever suggest or imply that it was acceptable behavior.

59.    Indeed, on a multitude of occasions, Plaintiff voiced and filed complaints about Mr. Doe to the supervisory or managerial agents and/or employees of Defendant.  When lodging such

complaints, Plaintiff expressly stated that Mr. Doe was creating a hostile work environment on the basis of race.

60.    However, despite have a plethora of opportunities to correct or otherwise remedy the hostile and abusive situation, Defendant declined to do so.  To the contrary, Defendant compelled, coerced, or otherwise forced Plaintiff to endure the racial hostile work environment that Mr. Doe created and sustained.

61.    The racial discrimination that Mr. Doe inflicted upon Plaintiff had a detrimental effect on Plaintiff and interfered with his ability to perform basic job duties such as tending the needs of Mr. Doe.

62.    Any reasonable person in the situation of Plaintiff would have been detrimentally affected if the comments or actions of Mr. Doe were directed at an African American individual.

63.    Given the sheer volume of complaints that Plaintiff lodged with Defendant, combined with Defendant's knowledge that Mr. Doe had previously perpetuated race discrimination against another African American individual, Defendant is liable for the actions and conduct of Mr. Doe.

64.    Moreover, in failing to remedy or rectify the intentional discrimination of Mr. Doe, Defendant acted with evil motive and a wanton disregard of Plaintiff's rights under Title VII to such an extent that punitive damages are warranted.

65.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

**COUNT II**
**HOSTILE WORK ENVIRONMENT ON THE BASIS OF GENDER**
**IN VIOLATION OF TITLE VII AND PHRA**
**42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.***

66.     Plaintiff incorporates the allegations contained the paragraphs above, as if fully set forth at length herein.

67.     Stated previously, from January 2020 to March 2022, Mr. Doe subjected Plaintiff to express and overt statements of a sexual nature that directly requested Plaintiff to perform sexual acts on him or instruct that Plaintiff engage in sexual acts with others.

68.     Oftentimes, Mr. Doe would accompany said statements with physical gestures that were violent in nature, such as hurling objects at Plaintiff.

69.      In the course of the period mentioned above, Mr. Doe committed isolated incidents that were so egregious or profoundly shocking that they, standing alone and considered apart from one another, constituted intentional gender discrimination that was shockingly and extremely "severe" for purposes of Title VII.

70.     Alternatively, on the collective whole, Mr. Doe perpetrated a course of conduct upon Plaintiff that constituted a regular, consistent, and routine pattern or practice of intentional gender discrimination that was sufficiently "pervasive" for purposes of Title VII.

71.     Plaintiff considered the intentional gender discrimination by Mr. Doe to be unwelcome and at no time did Plaintiff ever suggest or imply that it was acceptable behavior.

72.     Indeed, on a multitude of occasions, Plaintiff voiced and filed complaints about Mr. Doe to the supervisory or managerial agents and/or employees of Defendant.  When lodging such

complaints, Plaintiff expressly stated that Mr. Doe was creating a hostile work environment on the basis of gender.

73.     However, despite have a plethora of opportunities to correct or otherwise remedy the hostile and abusive situation, Defendant declined to do so.  To reiterate, Defendant compelled, coerced, or otherwise forced Plaintiff to endure the sexually hostile work environment that Mr. Doe created and sustained.

74.     The gender and/or sex discrimination that Mr. Doe inflicted upon Plaintiff had a detrimental effect on Plaintiff and interfered with his ability to perform basic job duties such as tending the needs of Mr. Doe.

75.     Any reasonable person in the situation of Plaintiff would have been detrimentally affected if the comments or actions of Mr. Doe were directed at a biological male, or any individual for that matter.

76.     Given the sheer volume of complaints that Plaintiff lodged with Defendant, Defendant is liable for the actions and conduct of Mr. Doe.

77.     Moreover, in failing to remedy or rectify the intentional discrimination of Mr. Doe, Defendant acted with evil motive and a wanton disregard of Plaintiff's rights under Title VII to such an extent that punitive damages are warranted.

78.     As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT III
**RETALIATION FOR REPORTING RACE DISCRIMINATION**
**IN VIOLATION OF TITLE VII AND PHRA**
**42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.***

79.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

80.    To advance a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001).

81.    As averred hereinabove, in the course of two years and three months, Plaintiff lodged or filed both verbal and written complaints to a vast array of supervisors, managers, and human resources' personnel of Defendant protesting the racially hostile work environment that Mr. Doe created and sustained.

82.    Over time, Plaintiff also protested Defendant and its supervisor or managerial agents and/or employees for failing to address his previous complaints about Mr. Doe.

83.    In early March 2022, Plaintiff engaged in protected conduct under Title VII when he renewed his complaint to Defendant that Mr. Doe was subjecting him to a racially hostile work environment.

84.    Less than two weeks later, Defendant terminated Plaintiff from employment.

85.    Given the close temporal proximity that exists between the time Plaintiff engaged in protected activity to the time Defendant discharged Plaintiff, a sufficient causal relationship exists between the two.

86.    In light of the timing sequence mentioned directly above, the sheer volume of complaints that Plaintiff filed with Defendant regarding racial discrimination, and Defendant's utter inaction to address that racial discrimination in any manner whatsoever, it must be concluded that Defendant retaliatorily terminated Plaintiff because he filed internal discrimination complaints with Defendant.

87.    Moreover, considering all the above, Defendant acted with evil motive and a wanton disregard of Plaintiff's rights under Title VII to such an extent that punitive damages are warranted.

88.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

<u>COUNT IV</u>
**RETALIATION FOR REPORTING GENDER DISCRIMINATION
IN VIOLATION OF TITLE VII AND PHRA
42 U.S.C. § 2000e,** *et seq.***; 43 P.S. § 951,** *et seq.*

89.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully

set forth at length herein.

90.     To restate, throughout his employment, and on a routine and regular basis, Plaintiff

lodged or filed both verbal and written complaints to an assortment of supervisors, managers, and

human resources' personnel of Defendant protesting the sexually hostile work environment that

Mr. Doe created and sustained.

91.     Through the passage of time, Plaintiff then protested Defendant and its supervisor

or managerial agents and/or employees for failing to address his prior complaints about Mr. Doe.

92.     In the beginning of March 2022, Plaintiff engaged in protected conduct under Title

VII when he renewed his complaint to Defendant that Mr. Doe was subjecting him to a sexually

hostile work environment.

93.     Less than two weeks later, Defendant terminated Plaintiff from employment.

94.     Given the close temporal proximity that exists between the time Plaintiff engaged

in protected activity to the time Defendant discharged Plaintiff, a sufficient causal relationship

exists between the two.

95.     In light of the timing sequence mentioned directly above, the sheer volume of

complaints that Plaintiff filed with Defendant regarding sexual discrimination, and Defendant's

utter inaction to address that sexual discrimination in any manner whatsoever, it must be concluded

that Defendant retaliatorily terminated Plaintiff because he filed internal discrimination complaints

with Defendant.

96.     Further, considering all the above, Defendant acted with evil motive and a wanton disregard of Plaintiff's rights under Title VII to such an extent that punitive damages are warranted.

97.     As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT V
### DISCRIMINATORY TERMINATION ON THE BASIS OF RACE
### IN VIOLATION OF TITLE VII AND THE PHRA
### 42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.*

98.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

99.     To establish a *prima facie* case of discrimination pursuant to Title VII, Plaintiff must prove that he "(1) was a member of a protected class, (2) was qualified for the position at issue, (3) suffered an adverse employment action, and (4) was ultimately replaced under circumstances that support an inference of unlawful discrimination."  *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) (internal citations and alterations omitted).

100.    Plaintiff belongs to a protected category because both Title VII and the PHRA cover "race," and Plaintiff is an African American.

101.    Plaintiff is a highly qualified individual who was competent to successfully complete the necessary functions of his job.  This is established by the fact that, in his 18 year

career as an in-home support and care worker, Plaintiff received numerous exemplary performance reviews for his workplace efforts and work ethic and never faced any disciplinary action by an employer until Defendant terminated him.

102.    When Defendant terminated Plaintiff, it subjected Plaintiff to the ultimate adverse employment action.

103.    In light of the practices, policies, and pattern of inaction on the part of Defendant in failing to address a racially hostile work environment, which actively and affirmatively promoted race discrimination, as well as the timing sequence detailed above concerning Plaintiff's then latest complaint regarding race discrimination and the decision to terminate him, a natural and necessary inference emerges that Defendant discharged Plaintiff on the basis of his race.

104.    Moreover, in view of the averments made previously, Defendant acted with evil motive and a wanton disregard of Plaintiff's rights under Title VII to such an extent that punitive damages are warranted.

105.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

<u>COUNT VI</u>
**DISCRIMINATORY TERMINATION ON THE BASIS OF GENDER
IN VIOLATION OF TITLE VII AND THE PHRA
42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.***

106.    Plaintiff belongs to a protected category because both Title VII and the PHRA cover "gender" or "sex," and Plaintiff is a heterosexual male.

107.    Plaintiff is a highly qualified individual who was competent to successfully complete the necessary functions of his job.  This is demonstrated by the fact that, in his 18 year career as an in-home support and care worker, Plaintiff received a multitude of exemplary performance reviews for his workplace efforts and work ethic and was not imposed with disciplinary action by an employer until Defendant terminated him.

108.    When Defendant terminated Plaintiff, it subjected Plaintiff to the ultimate adverse employment action.

109.    Given the practices, policies, and pattern of inaction on the part of Defendant in failing to address sexually hostile work environment, which actively and affirmatively promoted gender discrimination, as well as the timing sequence detailed above concerning Plaintiff's then latest complaint regarding gender discrimination and the decision to terminate him, it is necessarily inferable that Defendant discharged Plaintiff on the basis of his gender.

110.    Finally, in view of the averments made previously, Defendant acted with evil motive and a wanton disregard of Plaintiff's rights under Title VII to such an extent that punitive damages are warranted.

111.    As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment

and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

<u>**PRAYER FOR RELIEF**</u>

Plaintiff, Jamal Colbert, respectfully requests this Honorable Court to enter judgment in his favor, and against Defendant, Resources for Human Development, Inc. and prays for relief as follows:

1.    Declare and find that Defendant committed one or more of the following acts:

   i.    Violated Title VII and/or the PHRA in creating a hostile work environment on the basis of Plaintiff's race;

   ii.    Violated Title VII and/or the PHRA in creating a hostile work environment on the basis of Plaintiff's gender;

   iii.    Violated Title VII and/or the PHRA in retaliating against Plaintiff for making internal complaints of race discrimination;

   iv.    Violated Title VII and/or the PHRA in retaliating against Plaintiff for making internal complaints of gender discrimination;

   v.    Violated Title VII and/or the PHRA in terminating Plaintiff from employment on the basis of race;

   vi.    Violated Title VII and/or the PHRA in terminating Plaintiff from employment on the basis of gender;

2.     Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;

3.     Award equitable relief in form of back pay and front pay;

4.     Award punitive damages sufficient to deter Defendant from engaging in future conduct of a similar nature;

5.     Award attorney's fees; and/or

6.     Award pre-judgment and continuing interest as calculated by the Court.

7.     Award any other relief that the Court deems to be equitable, fair, and just.

**JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: July 10, 2023                    By: _____
                                             Kyle H. Steenland (Pa. I.D. No. 327786)

The Workers' Rights Law Group, LLP
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220
Telephone: 412.910.9592
Facsimile: 412.910.7510
kyle@workersrightslawgroup.com

*Attorney for Plaintiff, Jamal Colbert*

22